IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MELISSA D. FRENCH,

      Petitioner,

v.                            CIV 09-0894 RB/CG

A. HICKSON, Warden, et al.,

      Respondents.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

This matter is before the Court on Melissa French's petition for a writ of habeas corpus under 28 U.S.C. § 2254, Respondents' Answer, the state court records, and Petitioner's reply.[1]  Because she filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case.  *E.g., AbdulKabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th  Cir. 2008).  All of the issues can be resolved on the record before me and, therefore, an evidentiary hearing is unnecessary.  *E.g., Schriro v. Landrigan,* 550

---

[1]  *See Docs. 1, 9, 10.*  For ease of reference, I refer to the state court record sources with the following abbreviations:  Transcript of Proceedings 11/25/03 ("*Trial Transcript I*"); Transcript of Proceedings 11/26/03 ("*Trial Transcript II*"); Record Proper, Volume One of One Pages 0000001 through 0000229 ("*RP Trial*"); Record Proper Volume One of One Pages 000001 through 000134 ("*RP Post.*").  The audio recordings are accompanied by clerk notes but were not transcribed.  I refer to the proceeding and its date, for example, "*Evidentiary Hearing 8/18/08.*"

U.S. 465, 475 (2007); *Sandoval v. Ulibarri,* 548 F.3d 902, 915-16 (10th Cir. 2008); Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts.  I recommend that the petition be denied and this action dismissed with prejudice.

# I.  Overview

The seven people involved in this case were acquainted in some way.  Petitioner and her ex-husband Haley French ("Haley") have children together.  At the time, Haley was sharing a residence with his girlfriend Jaime Porton ("Jaime").  Someone broke into Haley's residence and stole items.  Haley suspected Petitioner but Petitioner denied having anything to do with the theft.  *See e.g.,Trial Transcript I* at 18-19, 39-45 (Haley).

Petitioner was dating Donald Hamilton ("Hamilton").  A couple of months after the break-in, Petitioner saw a DVD player in Hamilton's car.  This made her suspect that Hamilton was the one who stole items from Haley and Jaime, and she told Haley of her suspicions.  A short while later, when she and others were socializing at Hamilton's house, Petitioner could not find her purse.  She suspected that Hamilton stole it.  In retaliation, Petitioner stole Hamilton's car keys.  Hamilton and Petitioner each denied stealing the other's property and they argued, which culminated in name-calling and in Hamilton trying to strangle Petitioner.  After their altercation, Petitioner used Hamilton's keys to steal electronic equipment from his car.  She showed the equipment to Haley, who identified them as his.  Petitioner also told Haley that Hamilton tried to strangle her.  She suggested that they steal Hamilton's car, either in hopes of finding the other items stolen from Haley or as restitution for the Haley/Jaime break-in.  *See Trial Transcript II* at 80, 83-97, 101-08 (Petitioner); *see also id.* at 19-24 (Haley); *id.* at 62-63, 76-77

(Petitioner's sister).

Traveling in tandem in two cars, Petitioner and four others drove to Hamilton's home where he lived with Joe O'Dean ("O'Dean").  Haley, Jaime, and Sean McMurray ("Sean") traveled in one car.   Petitioner and Joey Eicher ("Joey") traveled in the other. Petitioner identified Hamilton's residence to the others and the group then met at a convenience store.  Petitioner waited behind.  With drugs fueling their actions, Haley, Sean, and Jaime severely beat Hamilton.  Meanwhile, Joey wielded a tire iron and kept O'Dean confined to a corner of the home throughout Hamilton's ordeal.  Haley's gun accidently discharged.  The four assailants then fled when they heard sirens.  *See Trial Transcript I* at 22-29; 42-43 (Hamilton); *id.* at 53-60, 72-74 (Joey); *id.* at 102-10, 114 (Jaime); *Trial Transcript II* at 5-9 (Sean); *id.* at 26- 38, 42-48, 50-53 (Haley); *id.* at 90-95 (Petitioner).

The police apprehended the four assailants within minutes.  *See RP Trial* at 79. Petitioner gave a statement to the police.  *See e.g., Trial Transcript at II* at 96-100 (Petitioner); *RP Trial* at 6, 9.  The four assailants pleaded guilty.  Joey received probation, Jaime received a two-year term of imprisonment, and Haley and Sean each received a seven-year term of imprisonment.  *See e.g., Evidentiary Hearing 8/18/08.*

Petitioner rejected a plea offer to a sentence with a mandatory four-year term of actual imprisonment.  She did not want to serve any jail time because she had two small children (and was pregnant with a third child at the time of trial and sentencing).  In her view, she was not responsible for the events that transpired in the victims' home.  She also felt that she was much less culpable than the others.  Although the four assailants testified for prosecution, they also supported Petitioner's version of her limited role.  *See*

-3-

*Sentencing Hearing 4/19/04; Evidentiary Hearing 8/18/08.*  Indeed, the jurors were advised that while the others committed the acts in question, Petitioner "was not in the residence."  *RP Trial* at 77.

The jurors found Petitioner guilty of kidnapping O'Dean, a first degree felony that carried a basic term of imprisonment of eighteen years.  The trial judge sentenced accordingly.  *See State v. Abril,* 134 N.M. 326, 76 P.3d 644 (N.M. App. 2003) (trial judge did not err in imposing a "mandatory" eighteen-year term of imprisonment for a first degree felony under the 1999 version of N.M.S.A. § 31-18-15(A)(1)).  Thus, in the unsuccessful direct appeal, her appellate attorney focused on trying to overturn the conviction for kidnapping.  In the unsuccessful postconviction proceedings, her habeas attorney focused on finding a way to lower her sentence and secure an earlier release so that, at most, she would not be serving more time than the others.  It was not until her *pro se* petition for certiorari to the New Mexico Supreme Court[2] that Petitioner first mentioned most of the claims raised in her federal habeas petition.  *See e.g., See Sentencing Hearing 4/19/04; Evidentiary Hearing 8/18/08; RP Trial* at 109-15, 127-29, 143-48, 161-65, 168-72, 188-89, 196-201, 210-213; *RP Post.* at 1-10, 77, 88, 114; *Doc. 9,* Exh. BB; *Doc. 11* at 1-3.

## II.  Procedural Background & AEDPA Standards Of Review

After holding an evidentiary hearing on Petitioner's counseled motion to reduce

---

[2] There are two versions of the *pro se* petition, one attached to the federal petition and one attached to Respondents answer.  *See Doc. 1-2* at 1-44 (with the hand-written portion appearing at pages 1-24 and the rest consisting of attached exhibits); *Doc. 9-4* at 1-61; *Doc. 9-5* at 1-44 (with handwritten and file-stamped original appearing at *Doc. 9-4* pages 1-18 and the rest consisting of attached exhibits).  They are handwritten and have different handwriting styles in some portions.  They are virtually identical.  I refer to the file-stamped version.

sentence and state petition for habeas corpus, the trial judge issued a summary written

decision finding that Petitioner did not establish "ineffective assistance of counsel"

based on the claims before him.  *RP Post.* at  114.  During the evidentiary hearing, he

explained the reason for his decision in more detail.   *See Evidentiary Hearing 8/18/08.*

As the Tenth Circuit recently reiterated, under AEDPA standards,

> If a claim was addressed on the merits by the state courts, we may not
> grant federal habeas relief on the basis of that claim unless the state court
> decision "was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of
> the United States," 28 U.S.C. § 2254(d)(1), or "was based on an
> unreasonable determination of the facts in light of the evidence presented
> in the State court proceeding," *id.* § 2254(d)(2).  "When reviewing a state
> court's application of federal law, we are precluded from issuing the writ
> simply because we conclude in our independent judgment that the state
> court applied the law erroneously or incorrectly."  *McLuckie v. Abbott,* 337
> F.3d 1193, 1197 (10th Cir. 2003).  "Rather, we must be convinced that the
> application was also objectively unreasonable."  *Id.*  "This standard does
> not require our abject deference, but nonetheless prohibits us from
> substituting our own judgment for that of the state court."  *Snow,* 474 F.3d
> at 696 (internal quotation marks and citation omitted).
>
> If a claim was not resolved by the state courts on the merits and is
> not otherwise procedurally barred, our standard of review is more
> searching.  That is, . . . § 2254(d)'s deferential standards of review do not
> apply in such circumstances . . .

*Alverson v. Workman,* 595 F.3d 1142, 1146 (10th Cir. 2010).

Clearly established Supreme Court precedent is "dispositive" of the § 2254(d)(1)

analysis – "only if we determine that the law is clearly established do we inquire whether

the state court decision is either contrary to or an unreasonable application of that law."

*Fairchild v. Workman,* 579 F.3d 1134, 1139 (10th Cir. 2009).  As for whether the law is

"clearly established," federal habeas "courts may no longer extract clearly established

law from the general legal principles developed in factually distinct contexts."  *Lambert*

*v. Workman,* 594 F.3d 1260, 1263 (10th Cir. 2010).

> [If a petitioner] has not cited, nor have we found, any Supreme
> Court authority clearly establishing the. . . principles at issue here[,]
> [u]nder the AEDPA standards set out above, that is fatal to his claim.
> Unless and until the Supreme Court decides [the issue] habeas relief on
> this basis is unavailable, and it is not the province of this court to resolve
> the issue . . .

*Id.*

If there is "no Supreme Court precedent establishing the [ineffectiveness] rule"

that a petitioner asserts, then a federal court "retreats to the general *Strickland*

standard." *Crawley v. Dinwiddie,* 584 F.3d 916, 921-22 (10th Cir. 2009) (citing *Knowles*

*v. Mirzayance,* ___U.S. ___, ___, 129 S. Ct. 1411, 1419 (2009)).  That is, Petitioner

must show counsel's conduct was constitutionally deficient and that, but for the conduct,

the result of the proceeding would have been different.  Failure to make either showing

defeats the claim.  *E.g., Smith v. Robbins,* 528 U.S. 259, 285-86 & n.14 (2000);

*Strickland v. Washington,* 466 U.S. 668, 687 (1984).  "'And, because the *Strickland*

standard is a general standard, a state court has even more latitude to reasonably

determine that a defendant has not satisfied that standard.'"  *Crawley,* 584 F.3d at 922

(quoting *Knowles,* 129 S. Ct. at 1420, which in turn cites *Yarborough v. Alvarado,* 541

U.S. 652, 664 (2004)).  This review is "doubly" deferential:

> . . . when evaluating an ineffective assistance of counsel claim
> under § 2254(d)(1), our review is "doubly deferential." . . .  We defer to the
> state court's determination that counsel's performance was not deficient
> and, further, defer to the attorney's decision in how best to represent a
> client.  *See id.; see also Yarborough v. Gentry,* 540 U.S. 1, 5-6 (2003) (per
> curiam).  In *Knowles,* the Court explained:

>> The question is not whether a federal court believes the
>> state court's determination under the *Strickland* standard
>> was incorrect but whether that determination was
>> unreasonable – a substantially higher threshold.  And
>> because the *Strickland* standard is a general standard, a

> state court has even more latitude to reasonably determine
> that a defendant has not satisfied that standard.
>
> 129 S.Ct. at 1420 (quotations and citation omitted); *see also Yarborough,*
> 541 U.S. at 664 ("The more general the rule, the more leeway courts have
> in reaching outcomes in case-by-case determinations.").

*Id.*

The level of deference to be given to the New Mexico Supreme Court's summary decision denying certiorari is not yet settled.[3]  Under Tenth Circuit decisions, because the certiorari denial plainly did not reject the claims on a procedural ground, the decision arguably qualifies as an "adjudication on the merits" and thus subject to the AEDPA standards of review.  Those Tenth Circuit decisions are binding and I further note that Respondents did not raise the issue of procedural default.[4]

In the end, however, whether I review the claims under AEDPA deference or *de*

---

[3]  After declining to address the issue in one recent decision, the Supreme Court then granted certiorari and asked the parties to brief whether ADEPA deference applies to summary dispositions.  *See Harrington v. Richter,* ___ U.S. ___, ___,130 S. Ct. 1506 (2/22/10) ("Case below, *Richter v. Hickman,* 578 F.3d 944.  Petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit granted. In addition to the question presented, parties are directed to brief and argue the following question:  Does AEDPA deference apply to a state court's summary disposition of a claim, including a claim under *Strickland* . . . ?"); *see also Smith v. Spisak,* ___ U.S. ___, ___, 130 S. Ct. 676, (1/12/10) ("Spisak contends that the deferential standard of review under § 2254(d)(1) should not apply to . . . the Ohio Supreme Court's summary rejection of this claim . . . However, we need not decide whether deference under § 2254(d)(1) is required here.  With or without such deference, our conclusion is the same.").

[4]  *E.g., Doc.11* at 3; *see also e.g., Sandoval v. Ulibarri,* 548 F.3d 902, 908-09 (10th Cir. 2008) ("this court has held that deference to a state court decision on the merits of a federal claim is appropriate even when the state court does not expressly articulate a rationale for its decision"), *cert. denied,* 130 S. Ct. 133 (2009); *Knapp v. Janecka,* 337 Fed. App'x 766, 768-69 (10th Cir. 2009) ("The New Mexico state district court denied Mr. Knapp's state habeas petition in a summary order of dismissal.  The Supreme Court of New Mexico subsequently issued an order denying his certiorari petition without analysis.  Nevertheless, under the deferential standard of review established for federal habeas claims by [AEDPA applied]") (citing *Aycox v. Lytle,* 196 F.3d 1174, 1177 (10th Cir. 1999)  for the proposition that with "collateral proceedings, we defer to the state court's decision, even if its reasoning is not expressly stated").

*novo,* the result is the same.  When a claim that is raised for the first time in federal habeas and it is "easily resolvable against the habeas petitioner," this Court may deny the claim on the merits.  *E.g., Lambrix v. Singletary,* 520 U.S. 518, 525 (1997); 28 U.S.C. § 2254(b)(2).  For the reasons below, none of Petitioner's claims provide a basis for habeas relief, regardless of whether they are reviewed deferentially or *de novo.*

## III.  Analysis

In a prior order, I listed the twelve claims.  *See Doc. 11* at 2.  Below, I construe them liberally and categorize and analyze them under the proper legal theories based on the facts Petitioner asserts.[5]

### A.  Noncognizable Claims

The testimony by trial counsel at the state evidentiary hearing and the comments by the trial judge during sentencing and the state evidentiary hearing reveal that, if the trial judge thought he could have appropriately done so, he would have reduced the eighteen-year kidnapping sentence.  Nonetheless, Petitioner's lack of contrition and acceptance of responsibility convinced him that a lower term of actual incarceration was not justified.  *See RP Trial* at 128; *Sentencing Hearing 4/19/04; Evidentiary Hearing 8/18/08.*

Petitioner claims that the trial judge erred by denying her motion to reconsider sentence.  *See Doc. 1* at 4, 9.  However, there is no assertion, or basis on the record to

---

[5]   *See, e.g., Roman-Nose v. New Mexico Dept. of Human Servs.,* 967 F.2d 435, 437 (10th Cir. 1992) ("The characterization of the action and the claim for relief by a *pro se* litigant is not dispositive on the availability of relief in federal court."); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991) ("A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers.").

conclude, that the sentence he gave was unauthorized or outside the statutory limits imposed by state law.  Absent those circumstances, claims of sentencing errors are not cognizable in federal habeas.[6]

Similarly, Petitioner claims that the trial judge erred in denying trial counsel's motion for a directed verdict based on insufficiency of the evidence for the O'Dean kidnapping, and erred in denying trial counsel's motion for a new trial, which was based on the same argument.  *Id.* at 9; *see also RP Trial* at 109-15.  To the extent Petitioner is arguing that the state court decisions were incorrect, these claims are not cognizable.[7] To the extent Petitioner is raising a federal sufficiency of the evidence claim, the claims are addressed on the merits below.

## B.  Merits

Most of Petitioner's federal claims lack any factual basis whatsoever and, thus, afford no basis for habeas relief.  To put those claims in perspective, however, I begin by addressing the sufficiency claims.

*Overview.*  Count I charged Petitioner with conspiracy to commit aggravated burglary, aggravated battery, and kidnapping.  Count II charged Petitioner with aiding

---

[6]  *See e.g., Dennis v. Poppel,* 222 F.3d 1245, 1258 (10th Cir. 2000), *cert. denied,* 534 U.S. 887 (2001); *Muniz v. Heredia* 340 Fed. App'x 457, 459 (10th Cir. 2009) (citing *Rael v. Williams,* 223 F.3d 1153, 1154 (10th Cir.2000)); *Schwartz v. Neal,* 75 Fed. App'x 265, 268-69 & n. 3 (10th Cir. 2006) (citing *Dennis* and *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)); *Lynch v. O'Dell,* 163 Fed. App'x 704, 707 (10th Cir. 2006) (citing *Dennis* and *Hawkins v. Hargett,* 200 F.3d 1279, 1281 (10th Cir. 1999)).

[7]  *See e.g., Bowser v. Boggs,* 20 F.3d 1060, 1065 (10th Cir. 1994) (errors of  state law are not cognizable under *Estelle, supra* note 6); *id.* ("federal courts hold no supervisory powers over state judicial proceedings") (citing *Smith v. Phillips,* 455 U.S. 209, 221 (1982)); *id.* ("'We do not sit as a 'super' state supreme court.'") (quoting *Smith v. McCotter,* 786 F.2d 697, 700 (5th Cir. 1986)).

-9-

and abetting aggravated burglary for the four codefendants' armed entry into Hamilton's residence.  Count III charged her with aiding and abetting aggravated battery for Haley's use of a firearm on Hamilton during the beating.  Count IV charged her with aiding and abetting aggravated battery for Joey's use of the tire iron on Hamilton during the beating.  Count V charged her with aiding and abetting aggravated battery for Jaime's use of a knife on Hamilton during the beating.  Count VI charged her with aiding and abetting aggravated battery for Sean's use of a stick on Hamilton during the beating. Count VII charged her with aiding and abetting Hamilton's kidnapping due to the way Haley, Jaime, and Sean carried out the beating.  Count VIII charged her with aiding and abetting O'Dean's kidnapping due to Joey's efforts with the tire iron.  *RP Trial* at 1.[8]

The jurors were instructed that, "to find the defendant guilty of conspiracy," the State had to prove beyond a reasonable doubt that (1) "defendant and another person by words or acts agreed to commit" specified crimes and (2) that "defendant and the other person intended to commit" the specified crimes.  *Id.* at 84.  For the other charges, the State's case was based on accessory liability.  The jurors were instructed that:

> A defendant may be found guilty of a crime even though she herself did not do the acts constituting the crime, if the state proves to our satisfaction beyond a reasonable doubt that:
>
> 1. The defendant intended that the crime be committed;
> 2. The crime was committed;
> 3. The defendant helped, encouraged or caused the crime to be committed.

---

[8]  The indictment contains ten counts.  Two of them are immaterial for this discussion – Counts IX and X charged Petitioner with making threats to Joey and his mother, Edna Eicher, and the jury acquitted her of these charges.  *See RP Trial* at 3.

*Id.* at 87.[9]   Consistent with New Mexico law, the jurors were further instructed that to find Petitioner guilty of kidnapping O'Dean, they had to find that O'Dean was "restrained or confined . . . by force or intimidation" with intent to "hold" him "against [his] will," either for the purpose of inflicting "death or physical injury" on him, or the purpose of "making [him] do something," or the purpose of "keeping [him] from doing something." *RP Trial* at 95.   The special interrogatory verdict forms for that charge also inquired whether they found "defendant inflicted great bodily harm on Joe O'Dean" or whether "defendant did not voluntarily free Joe O'Dean in a safe place." *Id.* at 74-75.[10]   During closing arguments, the prosecutor acknowledged that certain instructions sounded odd

---

[9]  A recent state decision contrasts conspiracy and accessory liability.

The jury was also instructed under a theory of aiding or abetting/accessory to crime liability and conspiracy to possess marijuana.  For a possession with intent to distribute conviction under an aiding or abetting theory, the State had to establish that:  (1) Defendant intended that the crime be committed, and (2) the crime was committed.  UJI 14-2822 NMRA.  "[A]n accessory must share the criminal intent of the principal[, which] can be inferred from behavior which encourages the act or which informs the confederates that the person approves of the crime after the crime has been committed." *State v. Carrasco,* 1997-NMSC-047, ¶ 7, 124 N.M. 64, 946 P.2d 1075  (citation omitted); *State v. Brenn,* 2005-NMCA-121, ¶ 24, 138 N.M. 451, 121 P.3d 1050  ("Intent is usually established by circumstantial evidence.").  Our statute defines conspiracy as "knowingly combining with another for the purpose of committing a felony." NMSA 1978, § 30-28-2(A) (1979).  To obtain a conviction of conspiracy, the State had to establish beyond a reasonable doubt that:  (1) Defendant and another person by words or acts agreed together to commit possession of marijuana with intent to distribute, and (2) Defendant and the other person intended to commit possession of marijuana with intent to distribute.  UJI 14-2810 NMRA.  "[C]ircumstantial evidence can be used to prove a conspiracy." *State v. Hernandez,* 104 N.M. 268, 277-78, 720 P.2d 303, 312-13 (Ct. App. 1986).

*State v. Lopez,* 146 N.M. 98, ___, 206 P.3d 1003, 1010 (N.M. App. 2009).

[10]  During deliberations, the jurors asked whether the trial judge could give them "a definition of voluntary as to Count VIII [O'Dean] kidnapping," and were instructed that it was for them "to decide." *Trial Transcript II* at 148-49.

because they read as though Petitioner herself committed the acts, but explained that

Petitioner

> certainly did not enter the dwelling.  She did no such thing.  But, legally the [instruction] phrase would be [that the others] entered [Hamilton's] dwelling . . . and because of her help, encouragement, or causation . . . it is as though the Defendant herself entered the dwelling.  Now, if you read the accessory instruction and put it in your head that the Defendants that you know did it would not have done it without her help and encouragement, and, therefore, it is as though the defendant herself was armed with a firearm, a tire iron, a knife or a wooden handle.  It is as though she, herself, touched or applied force to Donald Hamilton and also Joe O'Dean in a rude and angry manner . . .

*Trial Transcript II* at 133.

The jury's general and special interrogatory verdict forms initially caused

confusion as to Count I – the conspiracy count.  The special interrogatory form showed

they found Petitioner conspired to commit aggravated burglary, aggravated battery, auto

burglary, and unlawful taking of a vehicle, but that she did not conspire to commit

kidnapping.  *See id.* at 149-50.  However, the foreman had also signed the "not guilty"

general verdict form for conspiracy.  *Id.* at 149.  Defense counsel asked to poll the

jurors.  In response, the foreperson indicated that "I probably signed the wrong one," so

the trial judge sent them back to the jury room with the "three verdict forms for

conspiracy" for clarification.  *Id.* at 151-53.  They then returned with the "guilty" general

verdict for Count I conspiracy.  *Id.* at 153.  Their special interrogatory form remained the

same – Petitioner conspired to commit aggravated burglary, aggravated battery, auto

burglary, and unlawful taking of a vehicle, but did not conspire to commit kidnapping.

*RP Trial* at 64.  The jurors also found Petitioner not guilty as an accessory to:  Jaime's

aggravated battery with a knife, *id.* at 67; Haley's aggravated battery with a firearm, *id.*

at 69; or Hamilton's kidnapping, *id.* at 68.  They found her guilty as an accessory to:  the assailants' aggravated burglary, *RP Trial* at 70; Joey's aggravated battery with a tire iron, *id.* at 71; Sean's aggravated battery with a wooden handle, *id.* at 72; and O'Dean's kidnapping. *id.* at 73-74; *see also Trial Transcript II* at 150-51.

   ***Court of Appeals' Decision.***  Trial counsel raised the insufficiency claim for the O'Dean kidnap conviction as a matter of federal constitutional law, specifically citing *Jackson v. Virginia,* 443 U.S. 307 (1979) and the United States Constitution.  *See, e.g., RP Trial* at 112;  *id.* at 147.  The New Mexico Court of Appeals rejected the sufficiency argument, stating:

> We review the evidence to determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction."  *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988).  Under this standard, we "view the evidence in the light most favorable to support the verdict and resolve all conflicts and indulge all inferences in favor of upholding the verdict."  *State v. Hernandez,* 115 N.M. 6, 26, 846 P.2d 312, 332 (1993).  We do not reweigh the evidence, nor substitute our judgment for that of the fact-finder, so long as there is sufficient evidence to support the verdict.  *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319.

> Defendant's conviction for first degree kidnaping requires findings that Defendant restrained or confined Joe O'Dean (roommate) by force or intimidation; that Defendant intended to hold roommate against roommate's will; and that Defendant's actions were done to inflict death or physical injury on roommate or to make roommate do something or to keep roommate from doing something. . . .  *See* NMSA 1978, § 30-4-1(a)(3)( 2003).  Defendant could be found guilty of kidnaping as an accessory, even if she did not do the acts constituting kidnaping, if Defendant intended that the crime be committed; the crime was committed; and Defendant helped, encouraged, or caused the crime to be committed. . . .

> [Along with the facts that Petitioner accused Hamilton of theft and showed the others where he lived,] [e]vidence was presented that when Defendant observed [Joey] remove a tire iron from the trunk of his car . . .

she yelled to [Haley] "Don't do anything stupid" and warned that . . .
O'Dean was crazy and owned a firearm."

[Inside the Hamilton residence Joey] brandished the tire iron and
warned [O'Dean] not to interfere . . . . [Joey] testified that it was his job to
keep [O'Dean] from helping Hamilton either by intervening in the fight or
by leaving the residence to secure help [and O'Dean] remained in the
corner of the living room during the beating.

When the group heard police sirens [they] became worried and
quickly left . . . .  Defendant was acquitted of any charges involving
Hamilton, but was convicted for crimes involving [O'Dean].

We hold that the factfinder reasonable could have relied on the
foregoing evidence to support Defendant's conviction . . . .  Specifically,
evidence that [Joey told O'Dean] not to interfere, threatened [him] with a
tire iron, and kept [him] confined to a corner of the living room, supports
the crime of kidnaping.  Moreover, we hold that it was reasonable for the
jury to infer – based on Defendant's association with the group, her
cautionary statements regarding [O'Dean], and her act of showing the
group where Hamilton and [O'Dean] lived – that Defendant acted as an
accessory and intended for the crime to be committed and helped,
encouraged, or caused the crime to be committed. . . . Although . . . Joey
. . . may have been the group member who personally retrained (sic) or
confined [O'Dean], Defendant's role as an aider and abetter is sufficient.

*RP Trial* at 162-64.

The Court of Appeals rejected the legal argument that O'Dean was "freed to a

safe place" because he had been left in his home, holding it was "sufficient" that O'Dean

had been "restrained or confined" while inside his home.  *Id.* at 164.  It also rejected the

legal argument that the felony was a second-degree crime, because O'Dean was left in

his home unharmed, holding that O'Dean's "release was not voluntary, given [the

evidence that] that the group left the apartment only because of concern over the police

sirens."  *Id.* at 165.  As for Petitioner's testimony that it was Joey, and not Petitioner,

who pointed out where Hamilton's apartment was, the court held that "it was the fact-

finder's prerogative to disbelieve Defendant's version of the facts."  *Id.*

-14-

***Sufficiency Of The Evidence Analysis.***  Two of Petitioner's claims can be viewed as raising a sufficiency claim as to the O'Dean kidnapping conviction.  See, for example, discussion *supra* at § III.A.  She also claims that counsel was ineffective because he did not base his motion for a directed verdict based on a "'no show' of victim," *Doc. 1* at 6, meaning O'Dean, *see Doc. 9-4* at 6.  Though he was on the State's witness list, O'Dean did not testify at trial.  *See RP Trial* at 24.

The long-standing constitutional standard for sufficiency claims is that announced by the Supreme Court in *Jackson.*  The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson,* 443 U.S. at  319 (emphasis original).  The New Mexico Court of Appeals did not specifically cite *Jackson,* but that is of no import here.  The decisions it did cite – *Sutphin* and *Hernandez* – themselves adopted the *Jackson* standard.  Thus, the state court decision cannot be characterized  as "contrary to" for AEDPA purposes.[11]  Also, a state court's sufficiency decision is a "mixed question of law and fact" under 28 U.S.C. §§ 2254(d)(1) and (d)(2), thereby requiring this Court to inquire  "whether the facts are correct and whether the law was properly applied to the facts."[12]  The Court of Appeals

---

[11]  *See e.g., Valdez v. Bravo,* 373 F.3d 1093, 1096 n.1  (10th Cir.), *cert. denied,* 543 U.S. 1008 (2004); *Epperson v. Mullin,* 351 Fed. App'x 311, 314 (10th Cir. 2009); *Mora v. Williams,* 111 Fed. App'x 537, 541-542 (10th Cir. 2004); *Sutphin,* 107 N.M. at 131, 753 P.2d at 1319 ("the test to determine the sufficiency of evidence in New Mexico . . . is the same as enunciated in *Jackson*").

[12]  *Hicks v. Jones,* 350 Fed. App'x 199, 204 (10th Cir. 2009) (internal quotations and citations omitted) (quoting *Maynard v. Boone,* 468 F.3d 665, 673 (10th Cir. 2006) and citing *Brown v. Sirmons,* 515 F.3d 1072, 1089 (10th Cir. 2008)); *see also Diestel v. Hines,* 506 F.3d 1249, 1267 (10th Cir. 2007) (same proposition, quoting *Maynard*).

decision meets both inquiries.

I do not read the decision as having made any "factual" findings.  If the Court of Appeal's discussion of the inferences the jurors could have drawn qualify as such, then this Court must presume these "factual" findings are correct absent clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e).  Petitioner does not argue that the Court of Appeals decision rested on incorrect fact-finding.  Rather, she disagrees with the Court of Appeals' legal conclusion that all of the elements of the crime of kidnapping and accessory liability could have been found by the jurors.  Likewise, there is no allegation, or basis for finding, that the decision rests on historical facts not supported by the record or that there is clear and convincing evidence to contradict any factual findings.

Having applied the correct legal standard based on accurate historical facts, in a way that preserves the jury's province in matters of credibility and weighing the evidence, there is no basis to conclude that the Court of Appeals' decision was "unreasonable."  Circumstantial evidence is sufficient to support a verdict, and any rational jury could have found as it did for the reasons stated by the Court of Appeals.[13]

---

[13]  *See e.g., McDaniel v. Brown,* ____ U.S. ___, 130 S. Ct. 665, 673  (2010) (per curiam) ("a reviewing court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution") (internal quotations and citations omitted) (per curiam); *id.* at 675 (Justice Thomas and Justice Scalia concurring) ("I join the per curiam because it correctly holds that the Ninth Circuit erred in departing from *Jackson*'s mandate that a federal habeas court confine its sufficiency-of-the-evidence analysis to the evidence adduced at trial and, specifically, to all of the evidence admitted by the trial court.") (internal quotations and citations omitted; *Turrentine v. Mullin,* 390 F.3d 1181, 1197 (10th Cir. 2004) ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . .  [The] standard reflects our system's longstanding principle that it is the jury's province to weigh the evidence

Specifically, even if the jurors did not find that Petitioner and Joey "agreed" by words or acts to kidnap O'Dean, there was ample evidence from which they could find Petitioner intended that O'Dean be restrained by force or intimidation to preclude him from intervening in the confrontation and helped/encouraged/caused that to occur. Haley testified that Petitioner told him O'Dean "was crazy, and . . . had a gun." *Trial Transcript II* at 25.  Therefore, when he confronted Hamilton, Haley wanted others with him, wanted to arm himself, *id.* at 25, 27, and "may have" advised the others to arm themselves as well, though he did not recall "saying anything like that," *id.* at 28.  Joey testified that Petitioner got into his car, "told me that she was going to take us down to where [Hamilton] lived, and could I help Haley and watch his back." *Trial Transcript I* at 55.  Joey's car led the way, *id.* at 56, with Petitioner directing and pointing out the house, *id.* at 57, 9.  Joey also testified that because Petitioner told Haley that "O'Dean had a pistol," *id.* at 58, Haley advised him to "bring something," *id.*  As such, Joey "brought a tire iron." *Id.*  Sean testified that Haley told him that O'Dean "might have a gun," *Trial Transcript II* at 7, and so he armed himself with at "wooden handle . .. like a hatchet handle," *id.*  Petitioner testified that she saw Joey "open[] the trunk of his car and t[ake] out a tire iron." *Id.* at 94.  She told "Haley not to do anything stupid," *id.* at 95; *see also id.* at 109, because, as she later told the police, she thought that the group

---

and to draw reasonable inferences from testimony presented at trial. . . .  Our review under this standard is sharply limited[,] and a court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.") (internal quotations and citations omitted); *Rodriguez v. Roberts,* 2010 WL 1408330 at * 4 (10th Cir. 2010) (habeas review under *Jackson* – "Circumstantial evidence alone may support a criminal conviction.") (citing *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003)).

was on its way "to beat [Hamilton's] ass," not steal his car, *id.* at 120.

*"Inconsistency" Analysis.*  The fact that the jury found Petitioner guilty as an accessory to kidnapping O'Dean but not guilty of conspiracy to kidnap was not questioned in any state proceeding until Petitioner alluded to it in her *pro se* petition for certiorari with the New Mexico Supreme Court.[14]  Petitioner has not alleged "inconsistency" claim as one of the claims in her federal petition.  Nevertheless, because it is related to the sufficiency claim, I will comment briefly on why it would afford no basis for habeas relief, even if Petitioner had raised it here.

It may be that the jury's failure to find conspiracy to commit kidnapping was an oversight just like the original "not guilty of conspiracy" form.  But, even if it was not an oversight, contrary to Petitioner's assertion, the jury did not have to find that she "conspired" to kidnap O'Dean to find her guilty as an accessory to Joey's kidnapping of him.[15]  In New Mexico

> the crimes of conspiracy and accessory  to a crime are separate offenses
> based on separate acts for which the Legislature has intended multiple
> punishments.  *See State v. Armijo,* 90 N.M. 12, 15, 558 P.2d 1151, 1154
> (Ct. App. 1976) (holding that aiding and abetting and conspiracy are
> distinct and separate crimes). . . .  *See generally* Model Penal Code § 2.06
> cmt. 6(a) (discussing conspiracy and noting that under the Model Penal
> Code, conspiracy is not "a basis of complicity in substantive offenses
> committed in furtherance of its aims") (Official Draft and Revised
> Comments 1962).

---

[14]  There she asserted that the "inconsistencies of the trial jury's verdict was in the conviction of kidnapping in the first degree with no conspiracy charge.  The conspiracy was the underlying factor or motive in the kidnapping, etc. . . . The jury's verdict was therefore 'conflicted' and the trial court erred in not granting a new trial, directed verdict or lesser mitigated charge."  *Doc. 9-4* at 14.

[15]  For the elements of conspiracy and accessory liability, *see supra note 9*.

*State v. Carrasco,* 124 N.M. 64, 74, 946 P.2d 1075, 1085 (N.M. 1997); *see also RP Trial* at 163 (Court of Appeals decision cites *Carrasco* for elements of accessory liability). As explained above, Petitioner's conduct in warning that O'Dean was armed is sufficient circumstantial evidence of her intent that the crime be committed.  Nor can the "inconsistency" be an independent grounds for federal habeas relief under these circumstances.[16]

### C.  Claims Lacking In Any Factual Basis And/Or Failing To Meet Either Strickland Prong

Petitioner's remaining claims largely focus on the O'Dean kidnapping conviction in an ineffective assistance of counsel context.  By asserting what counsel should have done to undermine Hamilton's credibility and Joey's credibility and to bolster her own, the implicit argument is either that, had counsel done these things, the jury would have credited all of Petitioner's testimony and acquitted her or, at the very least, would not have convicted her of kidnapping.[17]  Few of these claims have any factual basis, much

---

[16]  *C.f., Bowser v. Boggs,* 20 F.3d 1060, 1064 -65 (10th Cir. 1994) ("Bowser claims that the Colorado Court of Appeals' evasion of state inconsistent-verdict law deprived him of his due process right to notice of the charges against him and his privilege against self-incrimination. We disagree. . . .  We will not second guess a state court's application or interpretation of state law on a petition for habeas unless such application or interpretation violates federal law.  As the Supreme Court recently declared: . . .  'federal habeas corpus relief does not lie for errors of state law.' . . . *Estelle* . . . the Colorado Court of Appeals' declination to apply its state's inconsistent-verdict law does not run afoul of federal law."); *Lucero v. Lemaster,* 131 Fed. App'x 636, 639 (10th Cir. 2005) ("In light of this evidence, as well as the instruction stating that deliberate murder and depraved mind murder are not mutually exclusive, the record does not support the inference that the jury misunderstood its charge and produced an incoherent verdict.  Accordingly, Lucero would not be entitled to relief from this verdict under either federal law or New Mexico law.  *See Masoner v. Thurman,* 996 F.2d 1003, 1005 (9th Cir. 1993); *State v. Fernandez,* 117 N.M. 673, 875 P.2d 1104, 1111 (1994).  It follows that Lucero's attorneys were not ineffective in failing to challenge the verdict on appeal.").

[17]  At the state evidentiary hearing, trial counsel testified that he believed he erred in not asking for the lesser-included offense instruction of on the O'Dean kidnapping count.  The trial

less constituting deficient conduct or prejudice under *Strickland.*   Under *Strickland,* this

Court does not "grade counsel's performance," 466 US. at 697.   Instead,

> Judicial scrutiny of counsel's performance must be highly deferential.   It is
> all too tempting for a defendant to second-guess counsel's assistance
> after conviction or adverse sentence, and it is all too easy for a court,
> examining counsel's defense after it has proved unsuccessful, to conclude
> that a particular act or omission of counsel was unreasonable. . . .   A fair
> assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the
> circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.   Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong
> presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the defendant must overcome
> the presumption that, under the circumstances, the challenged action
> "might be considered sound trial strategy." . . . There are countless ways

---

judge did not credit that testimony, holding that counsel's strategy was to pursue an "all or
nothing defense."  He also indicated that he was not convinced that the evidence would have
warranted the instruction.  *See Evidentiary Hearing 8/18/08.*  counsel pursued an "all or nothing"
defense.  *See Evidentiary Hearing 8/18/08.*  Petitioner did not raise the lesser-included claim
here, though she did argue it before the New Mexico Supreme Court.  *Compare Doc. 1* at 6, 7,
9, *with Doc. 9-4* at 14.  In any event, it is not grounds for habeas relief.

 A "'petitioner in a non-capital case is not entitled to habeas relief for the failure to give a
lesser-included offense instruction.'"  *Hicks v. Jones,* 350 Fed. App'x 199, 202-202 (10th Cir.
2009) (quoting *Lujan v. Tansy,* 2 F.3d 1031, 1036 (10th Cir. 1993) and also citing *Dockins v.
Hines,* 374 F.3d 935, 938 (10th Cir. 2004)).  Though state law may require such instructions
when there is evidence to support it, "there is no federal due process right to a lesser-included
offense instruction in a non-capital case the trial court's decisions cannot be contrary to or an
unreasonable application of clearly established federal law."  *Id.* at 202-203.  As the Tenth
Circuit held in *Hicks,* counsel is not ineffective for failing to request lesser-included instruction
where there is no evidence to support it and where the "state court denied post-conviction relief
on the ground that the evidence presented by Hicks at trial failed to support an instruction as to
any lesser-included offense."  *Hicks,* 350 Fed. App'x at 203-04 ; *see also Malicoat v. Mullin,* 426
F.3d 1241, 1252 -53 (10th Cir. 2005) (same re: evidence supporting instruction); *c.f., Florez v.
Williams,* 41 Fed. App'x 293, 295 (10th Cir.) ("whether counsel was ineffective for failing to
request lesser included offense instructions. . . .  Given that Florez was not entitled to a
voluntary intoxication instruction, and given the absence of other promising defenses, counsel's
decision . . . was not constitutionally unreasonable.  . . . defense held out the hope of a
complete acquittal, a hope that would have been undermined by presenting the jury with the
alternative of conviction on lesser included offenses. . . .  "We conclude that here the decision
not to request a lesser included offense instruction falls within the wide range of reasonable
professional representation."), *cert. denied,* 537 U.S. 1054 (2002).

to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at  689-691.

### 1.  Lack of Trial Preparation

***Co-Defendants' Plea Bargains.***  Plaintiff claims that her attorney was ineffective because he did not prepare for trial by "asking for a debriefing or deposition once the plea bargains were excepted (sic) and signed by all co-defendants."  *Doc. 1* at 6.  This claim first fails for lack of factual support.

Before trial, the judge ruled that under *State v. Brown,* although defense counsel could ask the four assailants about the counts (1) they had been charged with, (2) pleaded to, and (3) that had been dropped against them, he could not inquire about the sentences the they received.  *Trial Transcript I* at 4-7; *see also State v. Brown,* 123 N.M. 413, 415-16, 941 P.2d 494, 496-97 (N.M.) (holding that consistent with the "consequences of the verdict" rule announced in *Shannon v. United States,* 512 U.S. 573, 579 (1994), "it was not necessary for the jury to consider the full benefit Jeremy received in accepting the plea in order to properly assess any motive he might have had to lie.  The trial court properly limited defense counsel's cross-examination while thoughtfully allowing defense counsel an opportunity to reveal bias"), *cert. denied,* 522 U.S. 973 (1997).  It is obvious from this discussion about the scope of cross-examination and from opening statements that defense counsel was aware of the terms of the pleas.  For example, opening statement defense counsel included this observation:

> All four of these assailants have entered into plea agreements.  They pled to lesser forms of kidnapping, and they pled to a few other charges.  They

> are supposed to come here and testify truthfully before you.  I wonder
> when I ask them, why were you putting the word, quote, "narc," close
> quote, on his head.  In this blame game, we will all blame it on Melissa.
> Why did you put "narc" on his head?  Why would you want to put the word
> "narc" on Donald Hamilton's head before you did all of these other horrible
> things?  It will be interesting to see what their answers will be."

*Trial Transcript I* at 18-19.  A sidebar conference also revealed that the prosecutor had

given defense counsel copies of the assailants' "diagnostics."  *Trial Transcript II* at 34-

37.   Finally, trial counsel testified at the state habeas evidentiary hearing that he was

aware of the sentences the other co-defendants received.  *See Evidentiary Hearing*

*8/18/08.*

Even assuming for the purposes of argument that trial counsel did not know of

the substance of the co-defendants' bargains before trial, this claim also fails for lack of

prejudice.  During the course of their direct testimony, the State elicited the details of the

co-defendants' plea bargains, no doubt to undermine any effect those revelations would

have had if heard first on cross-examination.  During cross-examination, defense

counsel reemphasized the multiple and serious counts each assailant had been

charged with, compared to what he or she was allowed to plead to.  *See Trial Transcript*

*I* at 63-64, 75-77 (Joey); *id*. at 108-09, 114-15 (Jaime Porton French); *Trial Transcript II*

at 9-11 (Sean McMurray); *id.* at 31-32, 49-50 (Haley).

***Fingerprints On Weapons.***  Petitioner claims that her attorney was ineffective

for failing to request fingerprinting of the weapons the others used.  *See Doc. 1* at 6.

There is no remote chance of prejudice for this asserted failure, because there was no

dispute that Petitioner was not physically present where the beating took place.  Indeed,

it was a stipulation at trial, which the jurors were instructed to accept as true.  *See Trial*

*Transcript I* at 78-79 ("These are facts that the parties accept as true, and you can accept these as facts in the case."); *Trial Transcript II* at 121 ("A stipulation is an agreement that certain facts are true and you should regard such agreed-upon facts as being true.  And the same goes for the other stipulation that I read to you earlier.").  As discussed previously, the prosecutor and instructions explained why Petitioner could be liable as an accessory even if she was not present for the events that transpired in the victims' home.

 ***Provide "Defense" Witnesses.***   Petitioner makes the conclusory claim that her attorney was ineffective because he failed to "investigate the cause" and "provide defendant witnesses."  *Doc. 1* at 6.  It is unclear exactly what Petitioner means since the trial plainly contained a defense, with the prosecution witnesses corroborating Petitioner's defense of her limited role.  Based on her arguments in her petition for certiorari to the New Mexico Supreme Court, I believe Petitioner's specific claim is that counsel failed convince the jury that Hamilton choked her.  I find it without merit.

 First, "defense" witnesses did testify on this point.  Haley and Joey both testified to seeing bruising on Petitioner's neck.  Haley testified that the bruising on her "neck was black and blue."  *Trial Transcript II* at 24.   Joey testified that he saw a "red mark on her neck.  It looked like a hickey."  *Trial Transcript I* at 54.  Moreover, the defense put on two other witnesses.  Hamilton's father testified that his son is not an honest person.  *Trial Transcript II* at 56-58.  Petitioner's sister testified that she witnessed Hamilton trying to choke Petitioner and "pulled my sister out  . . . and we left."  *Id.* at 63.

 Second, if Petitioner is alluding to the allegations and additional witnesses she mentioned in her certiorari petition with respect to the choking incident, I note that there

is no factual basis for the claim.  Contrary to Petitioner's assertion, the jurors did hear evidence of the "prior strangulation."  *See Doc. 9-4* at 8 ("defense failed to substantiate the mitigating circumstances of prior strangulation and robbery  . . . counsel failed to introduce evidence of he assault which would have swayed the trial jury.").  She also faults defense counsel for failing to provide "expert witnesses to impeach the state's medical expert."  *Doc. 9-4* at 7 ("Defense counsel failed to provide witnesses for the defense.  The only witness was defendant's sister who witnessed the attack on defendant by the victim.  What the defense should have accomplished was to provide expert witnesses to impeach the state's medical expert witnesses.  The wounds were not serious.").  However, based on my review of all the audio, transcripts and documents,  however, the prosecutor did not present expert medical testimony on the choking incident pretrial, trial, or postconviction[18].  And if, as Petitioner asserts, trial counsel should have called a "convenience store clerk who was asked 3 x to call the police on behalf of the defendant who had been strangled and assaulted by [Hamilton]," *id.*, that testimony would have contradicted Petitioner's sister, who testified she saw the incident, was the one who came to Petitioner's aid, and took her home, *Trial Transcript II* at 63.

Finally, under *Strickland,* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

---

[18]  If Petitioner is referring to the portion of her sentencing diagnostic report where the supervising psychologist noted that the "police report indicated there were no visible marks from this incident and that she had not filed a police report," *Evidentiary Hearing 8/18/08,* Exh. 2 at 5, that evidence was not before the jury and I have already concluded that sentencing issues are not cognizable.

466 U.S. at 691.  Thus, the

> reasonableness of counsel's actions may be determined or substantially
> influenced by the defendant's own statements or actions.  Counsel's
> actions are usually based, quite properly, on informed strategic choices
> made by the defendant and on information supplied by the defendant.  In
> particular, what investigation decisions are reasonable depends critically
> on such information.  For example, when the facts that support a certain
> potential line of defense are generally known to counsel ***because of what
> the defendant has said, the need for further investigation may be
> considerably diminished or eliminated altogether.***

*Id.* (emphasis added).  Here, Petitioner provided the police with statements that are not

in the record before me, but I need not expand the record further.  I find that Petitioner's

trial testimony necessarily must have been consistent with her statements to the police.

Petitioner's testimony was consistent with the parts of a subsequent diagnostic report

that discusses contents of her statements.  Moreover, the prosecutor had very little

cross-examination based on Petitioner's statement to the police statement.  *See Trial*

*Transcript II* at 100-17,119-20.  Trial counsel could not ignore Petitioner's recorded

version of the events that, although she was not at the scene of the beating, she was

involved with the others.  The trial witnesses included the testimony of all four assailants

plus Petitioner, Hamilton, Hamilton's father, and Petitioner's sister.  It is hard to

conceive of any noncumulative witness trial counsel could have called to testify on this

point.  Thus, I find that counsel was not deficient in his alleged failure to investigate or

present evidence of the choking incident, and that Petitioner cannot establish the

requisite prejudice.

### 2.  Trial Conduct

***"Prejudicial" Photographs.***  Petitioner claims that her attorney was ineffective

for failing to object to the introduction of bloody and prejudicial photographs at trial.  *See*

*Doc. 1* at 6.  All of the photographs of Hamilton were taken after he returned from the hospital and had been cleaned up and bandages.  None of these photographs are remotely "bloody."  The pictures of the scene at the house do show blood spatter on walls, furniture, bedding, and clothing.  It is true that this Court only has black and white copies of pictures that the prosecutor described as depicting items "soaked" with blood. *See Trial Exhibits* (State's photos 1-30).  Nevertheless, the photos are not at all gruesome, nor are they so shocking or prejudicial as to have had any adverse effect on the jury, much less render the trial fundamentally unfair.  Both individually and collectively, they are mild compared to what is shown on movies and television.  And, they were obviously relevant to show the crime scene and the victim's injuries.  *See e.g., Wilson v. Sirmons,* 536 F.3d 1064, 1115-16 (10th Cir. 2008) (introduction of gruesome and gory photographs did not violate due process).  Thus, there is no basis to find counsel's conduct was "deficient" or "prejudicial" because of the photos.

**Undamaged Door.**  Petitioner asserts that her trial attorney failed to investigate and introduce a photo of the door to the victim's home that would show no damage to the door.  *See Doc. 1* at 6.  Petitioner argued to the New Mexico Supreme Court that the undamaged door is important because it supports "various statements" that the assailants "'knocked on the door'" and thus establishes that the "incident began as a confrontation rather than a home invasion [and] [a]t no point did the victims choose to close the door on co-defendants."  *Doc. 9-4* at 8.  In fact, the pictures introduced at the trial do clearly show that there was no damage to the door.  *See Trial Exhibits* (State's photos 1-30; photos Court has identified as 8, 9, 10, 13, because stickers are apparently on the backs of the photos and were not xeroxed).  Moreover, her

-26-

characterization of the testimony is inaccurate. The testimony was not that the assailants broke down the door, it was that they knocked first, and when O'Dean opened the door, they barged through it. *E.g., Trial Transcript I* at 23, 59.

   ***Impeaching Joey With His "Grand Jury" Testimony.*** Petitioner claims that her trial attorney was ineffective for failing to impeach Joey with his grand jury testimony. *See Doc. 1* at 7. It is not entirely clear what she means by this assertion.

   Petitioner may be basing this claim on a sentence from cross-examination where counsel was asking Joey about his statements to the police and asked if Joey had "testified since then when you testified at the grand jury proceeding; is that correct?," to which he answered "no." *Trial Transcript I* at 68. Counsel did not clarify whether "no" meant Joey did not testify before the grand jury or had not testified since. I have listened to the audiotape of the sealed grand jury testimony in its entirety. As the written record reflects, Joey did not testify before the grand jury in Petitioner's case – his mother Edna did. *See RP Trial* at 3 (grand jury indictment – "witnesses upon whose testimony this Indictment is bases are as follows: George Ortiz, Edna Eicher, Jaime Porton."). In addition, the record reflects that defense counsel ***did*** in fact request of the grand jury audiotapes on 11/27/02, so he must have known that Joey did not testify there. *See id.* at 7, 8, 33. Moreover, none of the testimony from this grand jury would have been useful for impeachment purposes.[19]

---

[19] None of the Grand Jurors asked any question about Joe Eicher. Edna's grand jury testimony was entirely consistent with her trial testimony, which focused almost exclusively on threatening telephone calls. She did not testify about anything her son told her. Officer Ortiz testified that he spoke to Joey after the incident and interviewed him, but the only thing Joey told him was that Haley and Melissa French recruited him and others to assist in retaliation for the alleged theft and attempted strangulation. This is entirely consistent with Petitioner's own trial testimony.

Petitioner may be basing this claim on testimony from another grand jury proceeding, perhaps a grand jury that indicted the four assailants.  *See Trial Transcript I* at 47-48 (Hamilton's testimony:  "Q:  Now, you were asked to testify at the grand jury that involved Melissa French?  A.  That's correct.  Q.  That was sometime after the grand jury involving the other four; is that correct?  A.  Yes.").  If so, that grand jury proceeding was not submitted with the record proper here.  I need not expand the record further, though, because Petitioner explains precisely Joey's testimony would have been impeaching.  Her federal petition provides:  "Eicher's statements made in grand jury.  He alternated between stating he had 2 to 3 children[,] proving all of his story's were conflicting."  *Doc. 1* at 7.  The impact Petitioner believes this would have had is vastly overstated and ultimately without merit.  To find prejudice under *Strickland,*

> [i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test, . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding.

466 U.S. at 693.  I find that the impeaching effect of this testimony would have had a negligible, if any, impact.  It also is insufficient for the Court to conclude that the counsel's failure to ask Joey about this point would have resulted in a different outcome at trial, much less a reasonable probability that there is reason to "undermine confidence in the outcome" of the state proceedings.  *Id.* at 694.

***Impeaching Joey With His Letter.***  Petitioner claims her attorney was ineffective for failing to impeach Joey with a pretrial letter he wrote to the trial judge.  *Doc. 1* at 7.  Joey's letter is not part of the state court record submitted to this Court by the State.  In fact, the Attorney General's office wrote to Petitioner advising her that the

letter she mentioned was not part of the record and recommending that she submit it to

this Court.[20]   To-date, Petitioner has not provided the Court with a copy of the letter but

her federal petition explains why Petitioner believes the letter would have been

impeaching:

> [In the letter,] Eicher expresses remorse and says in the beginning he
> 'tried to blame what happened on co-defendants.'  This is an obvious
> admission of guilt as well as an indication that he had falsely blamed
> others for his own part.

*Doc. 1* at 7.

There is no merit to the claim.  Defense counsel specifically referred to the letter

during his cross-examination of Joey.  *See Trial Transcript I* at 68 ("Q.  And you gave a

handwritten statement to the Judge before you were sentenced?  A. Yes.  Q.  You

never said that the money was for a vacuum cleaner until today' is that correct?  A.  No,

---

[20]  The letter provides in pertinent part:

Warden Hickson has been ordered by Judge Garza to submit for her review the
entire state court record including transcripts, tapes, exhibits and, specifically, a
letter written by Joey Eicher to state district court judge Michael E. Vigil.

As of today's date [February 2, 2010], the letter has been unavailable despite
attempts made to locate this letter.  According to the Santa Fe County Court
Clerk, the letter is not part of the state court record; state district court judge
Michael E. Vigil does not have the letter in his possession nor does your former
attorney, Stephen D. Aarons.  At your request, Mr. Aarons provided his original
file to your father-in-law, Robert French.  It is unclear whether the letter is in the
original file.

This letter is to alert you that you are also permitted to supplement the record
with the letter.  If you are unable to obtain the letter written my Mr. Eicher, I would
suggest you provide it to Magistrate Judge Garza as soon as practicable.  An
additional copy of the Order for Supplementation is enclosed for your review.
Thank you. . . .

/s/ . . . Paralegal-Habeas Administrator Criminal Appeals Division.

*Letter Dated 2/2/10.*

I didn't, not to anybody else, just to my attorney.").  In fact, counsel asked about this very aspect of the letter on cross-examination.  *Trial Transcript I* at 69 ("Q.  Now, when you spoke to the Judge, or wrote to him, you said that you tried to blame it on drugs and the co-Defendants, but you have learned that really you are to blame for yourself.  A. For my actions, yes.").

Counsel's conduct cannot be considered "deficient" when the record reflects that he questioned Joey on the very point Petitioner asserts he failed to do.  Nor can Petitioner establish prejudice.  Both the fact of Joey's participation and initial attempt to lay off the blame on others was before the jurors.  Thus, I find that Joey's self-serving letter for sentencing purposes would not have impacted the outcome in any way, or in any way undermines my confidence in the state proceedings.

### 3.  Failure To Inform Of Plea Bargain Offers

Petitioner claims that her attorney was ineffective because he failed to inform her of plea bargains offered to her.  *See Doc. 1* at 6.  This claim is utterly without merit as evidenced by Petitioner's own statements during sentencing where the following colloquy concerning the plea offer took place:

> Prosecutor . . . Melissa French rolled the dice and the jury came up with a decision. . . .
> Defendant:  I just want to say that I was not offered the same plea that the other four defendants were.  From the beginning she wanted to give me eighteen years – .
> Prosecutor:  – Your Honor . . .  I've never offered anything directly to Ms. French and I don't know what [defense counsel] told her, but that is a flat-out lie.
> Judge:  What was the offer?
> Prosecutor:  Some pen time . . .

* * * * *

> Defendant:  . . . she'd offered a plea of more than anybody else who actually admitted the crimes.  I was never offered a zero to anything or a one to anything like the other people had options of doing  – my minimum was four, automatically . . .

*See Sentencing Hearing 4/19/04.*  The testimony at the state habeas evidentiary hearing reiterated that those were the terms of the plea offered to Petitioner.  *See Evidentiary Hearing 8/18/08.*  Plainly, Petitioner was aware of the offer but did not like it.

### *4. Conclusion*

For the reasons above, I find that, either individually or cumulatively, counsel's conduct was not "deficient"  or "prejudicial" within the meaning of those terms under *Strickland*.

Wherefore,

**IT IS HEREBY RECOMMENDED** that the § 2254 petition be denied, and this action dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE